UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JOHN SCOMA,

      *Plaintiff*,

                                  **MEMORANDUM & ORDER**

-against-                     16-CV-6693 (KAM)(SJB)

CITY OF NEW YORK, AZEEM CHATHA,
FERNANDO CACHES, DAMIR VUKIC,
ARGLEY DELACRUZ, FRANCISCO
ALLENDE, SPENCER CRAVEN, GREGORY
MANNINO, MATTHEW BRANDER, EDWARD
WASZAK, JOSEPH HAYWARD,
Individually, and JOHN AND JANE
DOE 1 through 10,

      *Defendants*.
----------------------------------X
KIYO A. MATSUMOTO, United States District Judge:

          Plaintiff John Scoma commenced this action against the

City of New York (the "City") Azeem Chatha, Fernando Caches,

Damir Vukic, Argely Delacruz, Francisco Allende, Spencer Craven,

Gregory Mannino, and Matthew Brander, (together with the City,

"defendants") on December 2, 2016 pursuant to 42 U.S.C. § 1983

("section 1983") and New York law asserting excessive force,

assault and battery, and a violation of his state constitutional

rights, in connection with his arrest on September 19, 2015.[1]

---

[1]    On February 4, 2020, this Court granted the parties' stipulation of
dismissal, dismissing plaintiff's first, second, fourth, fifth, ninth, tenth,
thirteenth, fifteenth, sixteenth, seventeenth, and eighteenth causes of
action against all defendants with prejudice. (*See* ECF No. 75, Stipulation
and Order of Voluntary Partial Dismissal with Prejudice.) All claims against
defendants Joseph Hayward and Edward Waszak were dismissed with prejudice.
(*Id.*) Plaintiff also agreed that plaintiff's Seventh and Eighth causes of
action would be limited to claims based on the alleged use of excessive
force. (*Id.*)

Presently before the court is defendants' motion for summary judgment as to all of plaintiff's causes of action.  In support of their motion, defendants have submitted a memorandum of law (ECF No. 80-2, "Def. Mem."), a statement of undisputed material facts pursuant to Local Rule 56.1 (ECF No. 80-3, "Def. 56.1"), and a declaration by Alan H. Scheiner, Esq., counsel for defendants (ECF No. 80-4, "Scheiner Decl."), together with accompanying exhibits.  (ECF Nos. 80-5 through 80-16.) Defendants have also submitted a reply memorandum (ECF No. 85-1, "Def. Reply"), and a reply to plaintiff's opposing Memorandum of Law and Local Rule 56.1 counter-statement of material facts.[2] (ECF No. 85-2.)

In addition to his Local Rule 56.1 counter-statement of material facts (ECF No. 82, "Pl. 56.1"), plaintiff has submitted a memorandum in opposition to summary judgment.  (ECF No. 84, "Pl. Mem.")  Plaintiff also submitted a declaration by Lissa Green-Stark, Esq., counsel for plaintiff (ECF No. 83, "Green-Stark Decl."), together with accompanying exhibits.  (ECF Nos. 83-1 through 83-25.)  Finally, the parties have submitted a Joint Deposition Appendix (ECF No. 85-7), consisting of excerpts

---

[2]     On July 1, 2020, with plaintiff's consent, defendants filed a motion to amend the submitted summary judgment papers to include Exhibit L to the Declaration of Alan H. Scheiner.  (ECF No. 86.)  The Court grants defendants' motion to amend the summary judgment papers to include Exhibit L, an excerpt of Department of Justice CED (Conducted Energy Devices) Guidelines, which was timely served on plaintiff with the original moving papers on March 3, 2020.

of eleven transcripts from plaintiff, defendant Officers, and non-party witnesses.

For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the parties' Local Rule 56.1 statement, counter-statement, and reply statement, as well as from documents and transcripts cited in the parties' Local Rule 56.1 statements.  Except as otherwise indicated, the facts set forth below from the parties' Local Rule 56.1 statements are undisputed.  The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

On the evening of September 19, 2015, plaintiff Scoma's neighbor, Christina Cosares, called 911 and reported that plaintiff was allegedly assaulting his then-wife Brielle Scoma.  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Ms. Scoma had come to the Cosares' house, crying and upset, and rang the doorbell. (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 4.)  Ms. Cosares and her husband observed Ms. Scoma visibly upset.  (Def. 56.1 ¶ 3.)  Plaintiff walked over to the Cosares' house and physically brought his wife back to their home.  (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 8.)  Ms. Cosares called 911 and reported, in sum and substance, that a

male was assaulting his wife and that the same man had pulled the wife from the Cosares' home. (Def. 56.1 ¶ 5; Scheiner Decl., Ex. D, Cosares Tr. at 26:5-27:8.) Ms. Cosares testified to seeing plaintiff grab Ms. Scoma by the neck and drag her down the steps towards plaintiff's home. (Green-Stark Decl., Ex. 2, Cosares Tr. at 17:5-12.) The 911 dispatcher reported the call to police officers as: "Male beating his wife she is ringing on bells . . . Perp[etrator] dragged fem[ale] aided down the block when she was knocking on doors for help." (Def. 56.1 ¶ 6; Scheiner Decl., Ex. C, at NYC 105.)

At approximately 7:50 p.m., Police Officers Azeem Chatha and Fernando Caches receive a radio call for an assault in progress. (Def. 56.1 ¶ 7; Scheiner Decl., Ex. E, at NYC 216-18; Ex. G, Chatha Tr. at 47:14-25.) Once Officers Chatha and Caches arrived at Ms. Cosares' home, she reported to them that Ms. Scoma had come running to her house, rang the bell, asked for help, and asked them to call 911. (Def. 56.1 ¶ 8; Scheiner Decl., Ex. G at 40:24-41:9, 50:18-51:10.) Ms. Cosares also reported to Officer Chatha that plaintiff had come over, grabbed Ms. Scoma by the neck, and dragged her back to the house.[3] (Def.

---

[3]    In her official statement prepared and signed on the date of the incident, Ms. Cosares reported: "I was in my home when the doorbell rang and my neighbor was screaming asking for help and when I opened the door the husband came grabbed her by the neck and dragged her back home and I call the police." (Scheiner Decl., Ex. D, at 30:15-31:17; Ex. J, at NYC 14.)

56.1 ¶ 9; Scheiner Decl., Ex. G, at 40:24-41:19.)  Plaintiff disputes that Ms. Scoma requested help, denies grabbing Ms. Scoma by the neck in front of the Cosares, and contends that no assault was occurring when Ms. Cosares reported an emergency to 911.  (Pl. 56.1 at 2-3, ¶¶ 12-14.)

Officer Chatha and Caches approached plaintiff's house and started knocking on the front door and all the windows, yelling "open the door, police."  (Def. 56.1 ¶ 12.)  Sergeant Damir Vukic received the same radio call for an assault in progress and proceeded to the scene of the incident together with Officer Argely Delacruz.  (Def. 56.1 ¶ 13.)  Sergeant Vukic arrived at plaintiff's home at approximately 8:00 pm and was informed by Officers Chatha and Caches of what Ms. Cosares had reported to them.[4]  (Def. 56.1 ¶¶ 13-14.)  After approaching the back of plaintiff's house and yelling "Police Department in front, please come outside," with no response, Sergeant Vukic instructed Police Officer Craven to kick in the back door of plaintiff's house, which Officer Craven did.  (Def. 56.1 ¶¶ 18-20.)  Once inside plaintiff's home, an officer opened the front door, allowing Officers Chatha and Caches to enter.  (Def. 56.1 ¶¶ 21-22.)  When entering the home, the Officers yelled "Police"

---

[4]     Sergeant Vukic testified that he proceeded to discuss with Ms. Cosares, who confirmed the sum and substance of what she had reported to Officers Chat and Caches -- namely, that an assault was in progress and that Ms. Scoma had requested assistance.  Plaintiff disputes that Sergeant Vukic spoke with Ms. Cosares, but offers no evidence in support.  (Pl. 56.1 at 3.)

and "Police. We are coming in. Police." (*Id.*) Plaintiff did
not hear the Officers because he was upstairs in the bedroom
with his wife and the air conditioners were on. (Pl. 56.1 ¶
23.)

Once inside plaintiff's home, the Officers reported
that Ms. Scoma came running downstairs from the upper level of
the house, screaming and crying. (Def. 56.1 ¶ 23; Scheiner
Decl. Ex. G, at 55:6-11, 63:19-64:7; Ex. H, at 66:17-20, 69:5-
10.) Plaintiff disputes the Officers' account and claims that
Ms. Scoma came downstairs at the direction of the police with
her hands held up in the air before she was accompanied out of
the house by an officer. (Pl. 56.1 at 4; Green-Stark Decl., Ex.
1, Brielle Scoma Tr. at 48:21-52:2.) Plaintiff then exited the
room at the top of the stars and stood at the top of the stairs
where he appeared to the officers to be angry and agitated.
(Def. 56.1 ¶ 24; Ex. H, at 70:21-71:5.) Officers remained on
the first floor of the home and asked plaintiff to come
downstairs, but plaintiff came only halfway down the stars and
then stopped about six or seven steps above the Officers. (Def.
56.1 ¶ 25.) Plaintiff, standing at 6'1" and weighing
approximately 240 pounds, was shirtless and wearing only a pair
of shorts. (Def. 56.1 ¶ 25-26.) From the bottom of the stairs,
the Officers perceived plaintiff as large and very muscular.

6

(Def. 56.1 ¶ 28; Scheiner Decl., Ex. H, at 72:17-73:3; Ex. I, at 55:17-56:2.)

According to plaintiff, after telling the Officers that he would come downstairs, he followed Ms. Scoma with his hands in the air, and when he reached approximately the sixth step, observed six police officers pointing guns at him. (Pl. 56.1 ¶ 37; Green-Stark Decl., Ex. 3, at 53:12-53:3.) The Officers directed plaintiff to come downstairs and to sit on the couch. (Pl. 56.1 ¶ 38; Green-Stark Decl., Ex. 3, at 53:12-54:3.) Mr. Scoma did not comply, but responded that he would sit on the steps of the stairs and, before sitting down, lowered his shorts to show the Officers that he was unarmed. (Pl. 56.1 ¶ 40-41; Green-Stark Decl., Ex. 3, at 54:2-10.) According to defendants, Sergeant Vukic and Officer Chatha explained to plaintiff that the Officers were responding to a 911 call and attempted to persuade, and again directed, plaintiff to come downstairs. (Def. 56.1 ¶ 29.) Plaintiff refused to come downstairs and according to the Officers' was yelling and screaming at the Officers, telling them to "get the fuck out of his house, [I'm] not going anywhere." (Def. 56.1 ¶ 30; Scheiner Decl., Ex. B, at 53:25-54:13.) According to plaintiff, he walked downstairs with his hands up, stopped halfway and said to the Officers: "what are you doing here," "you got a warrant to

be in this house," "get out of this house." (Scheiner Decl.,
Ex. B, John Scoma Tr. at 53:25-54:3.)

It is undisputed that plaintiff told the Officers to
get out of his house, stopped halfway down the staircase, sat
down, and did not comply with the Officers' directions to come
all the way downstairs to sit on the couch. At approximately
8:09 pm, Sergeant Vukic requested the assistance of the
Emergency Services Unit ("ESU"). (Def. 56.1 ¶ 31; Ex. E, at NYC
217.) In response, ESU Officers Francisco Allende and Detective
Brander arrived at plaintiff's home.[5] (Def. 56.1 ¶ 31-32;
Scheiner Decl., Ex. I, at 37:10-38:3, 39:3-9.) The ESU Officers
responded to a radio call and call from the Officers for a
domestic assault, and the dispatcher reported that a man was
"beating his wife." (Def. 56.1 ¶ 33; Scheiner Decl., Ex. I, at
44:10-45:21.)

It is also undisputed that once inside the home, the
ESU Officers observed plaintiff sitting on the staircase. (Def.
56.1 ¶ 35.) According to defendants, the ESU Officers asked
Sergeant Vukic if plaintiff was "under [arrest]" and Sergeant
Vukic replied in the affirmative. (Def. 56.1 ¶ 36.) Plaintiff

---

[5]     The parties dispute the timing of the ESU Officers' arrival to the
scene of the incident. According to defendants, the ESU Officers arrived
shortly after Sergeant Vukic's call, approximately fifteen minutes after the
police first gained entry to plaintiff's home. (Def. 56.1 ¶ 31.) According
to plaintiff, the ESU Officers arrived at approximately 8:30 pm, or
approximately 10 minutes after the first police Officers arrived at
plaintiff's home. (Pl. Response ¶ 31; Pl. 56.1 ¶ 53.)

testified that as he sat on the stairs above the Officers, he heard the Officers state that he was under arrest before the ESU Officers arrived (Green-Stark Decl., Ex. 3, John Scoma Tr. at 64:5-21). Plaintiff also testified that he was never told he was under arrest. (Green-Stark Decl., Ex. 3, John Scoma Tr. at 87:4-11.) Several officers testified that the ESU Officers and others continued to instruct plaintiff to come downstairs, which plaintiff refused to do. (Def 56.1 ¶ 37; Scheiner Decl., Ex. G, at 55:16-56:6, 93:17-23; Ex. H, at 87:9-25, 88:1-89:2; Ex. I, at 60:2-12, 63:9-20, 66:3-14, 67:17-68:7, 77:2-13.) Throughout this interaction, the Officers continued to perceive the plaintiff as angry and agitated. (Def. 56.1 ¶ 38.) ESU Officer Allende testified that he believed an attempt to physically seize plaintiff would be dangerous, based on his understanding of the criminal offense, his perception of plaintiff's demeanor, large physical size and strength, plaintiff's refusal to descend the stairs, plaintiff's insistence in refusing arrest, and the danger the narrow stairwell may pose to officers approaching the plaintiff from below. (Scheiner Decl. Ex. I, at 143:2-144:4, 146:17-21, 159:7-160:3.) Accordingly, after speaking with plaintiff for several minutes and unsuccessfully attempting to deescalate the situation, Officer Allende deployed a taser at plaintiff from below. (Def. 56.1 ¶¶ 44; Allende Dep. Tr., App'x E, 72:23-73:5.) Plaintiff testified that after the first taser

hit him in his bicep, he stood up, and was then hit with another taser in his forearm. (Scheiner Decl. Ex. B., at 54:14-17.) Two laser darts lodged in plaintiff's left arm. (Def. 56.1 ¶ 45.)

Plaintiff disputes defendants' characterization of the events leading up to the deployment of the taser. Plaintiff contends that upon entering his residence, an ESU Officer immediately said, "you are under arrest." (Pl. 56.1 ¶ 55.) Plaintiff said in response, "for what? He's telling me to sit on the couch." (Pl. 56.1 ¶ 56.) Plaintiff testified that the Officers told him to come down the stairs and sit on the couch but he remained on the stairs. (Scheiner Decl., Ex. B, at 53:22-54:3.) Then, without any further attempt at verbal negotiation or other means of restraint, ESU Detective Brander said, "hit him." (Pl. 56.1 ¶ 57.) At that point, Officer Allende discharged the taser for two, five-second cycles, with a four second interval between the two discharges. (Pl. 56.1 ¶ 60; Green-Stark Decl., Ex. 3, 54:13-18; Ex. 5 (taser report).) Officer Allende testified that he believed that he pressed the taser trigger once for approximately five seconds. (Scheiner Decl., Ex. I, at 84:10-21), but the record indicates the taser was deployed twice.

After Officer Allende deployed the taser, two ESU Officers (including Detective Brander) ran up the stairs,

grabbed plaintiff, and together brought plaintiff down the stairs. (Def. 56.1 ¶ 49; Scheiner Decl., Ex. H, at 91:22-25, 95:7-25.) It is undisputed that within approximately 30 seconds of the taser being deployed, Officers brought plaintiff off the stairs to the floor, handcuffed him, and walked him out of the house. (Def. 56.1 ¶ 50.) According to plaintiff, the Officers violently and roughly piled on plaintiff, one officer placed his knee on plaintiff's back, and plaintiff's arm was forcefully snapped while he was handcuffed, which fractured his elbow. (Pl. 56.1 ¶ 74.) The Officers testified that plaintiff struggled and resisted as they attempted to handcuff him. (*See* Green-Stark Decl., Ex. 17, at 33:24-34:18.) The circumstances and cause of plaintiff's elbow fracture is in dispute.

Following his arrest, plaintiff was then transported to Lutheran Medical Center Hospital. (Def. 56.1 ¶ 52.) While at the hospital, plaintiff complained of sharp pain in his left elbow. (Def. 56.1 ¶ 53; Scheiner Decl., Ex. K, at NYC 165.) Hospital records reflect that plaintiff reported no chest pain, shortness of breath, no abdominal pain or vomiting, no neck or back pain, no cough or fever, and "[n]o other signs of trauma to body." (Scheiner Decl., Ex. K, at NYC 165.) An x-ray was taken of plaintiff's left elbow and he was diagnosed with a fracture to his "coronoid process proximal ulna" and a "suspected fracture" to his proximal radial head. (Def. 56.1 ¶ 55;

Scheiner Decl., Ex. K, at NYC 160, 169.)  At the hospital, doctors removed two laser barbs, one from plaintiff's left bicep and the other from plaintiff's left forearm.  (Def. 56.1 ¶ 56.) Plaintiff was discharged from the hospital at 11:59 pm on September 19, 2015, about two hours and forty-five minutes after he was admitted.  (Def. 56.1 ¶ 57.)

Plaintiff was ultimately charged with Resisting Arrest, a class A misdemeanor, Attempted Assault in the Third Degree, a class B misdemeanor, Menacing in the Third Degree, a class B misdemeanor, Disorderly Conduct, a violation, and Harassment in the Second Degree, a violation.  (Pl. 56.1 ¶ 87; Green-Stark Decl., Ex. 21, Crim. Ct. Compl. P. 56.)  All charges were dismissed and sealed on March 21, 2016.  (Pl. 56.1 ¶ 88; Green-Stark Decl., Ex. 25.)

## II.  Procedural History

Plaintiff commenced the instant action by filing a complaint against defendants on December 2, 2016.  (ECF No. 1.) The parties proceeded to discovery under the supervision of the Honorable Cheryl Pollak and Sanket J. Bulsara, United States Magistrate Judges.  (*See*, *e.g.*, July 5, 2017 Minute Entry, ECF No. 15; September 14, 2017 Docket Minute Entry.)  Plaintiff filed an amended complaint against defendants on December 19, 2017 (ECF No. 18), and a second amended complaint on July 26, 2018.  (ECF No. 44, Second Amended Complaint ("SAC").)  On

12

January 23, 2020, the court granted defendants leave to file the instant motion and set a briefing schedule (*see* January 23, 2020 Minute Entry), and as contemplated in that briefing schedule, the motion was fully briefed and submitted on June 26, 2020.

## LEGAL STANDARD

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).

### I.   Summary Judgment

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or

is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *accord Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) ("[I]n ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson*, 477 U.S. at 255)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256-57.  To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)

(emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

In opposing summary judgment, it is "not sufficient merely to assert a conclusion without supplying supporting arguments or facts," and a party must instead set forth "concrete particulars." *BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotation marks and citations omitted). Accordingly, "[t]he nonmoving party must go beyond the pleadings, and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citations omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## DISCUSSION

Plaintiff's SAC asserts eighteen causes of action, including federal Section 1983 claims of excessive force and failure to intervene, and supplemental state law claims of assault and battery, and under the New York Constitution, arising from an incident which occurred on September 19, 2015. (*See* SAC ¶¶ 40-129.) By Stipulation and Order entered on February 4, 2020 (ECF No. 75), the Court dismissed with prejudice all claims not arising from alleged excessive force and also dismissed with prejudice all claims against two

15

individual defendants, Deputy Inspector Joseph Hayward and retired Police Officer Edward Waszak.  Defendants seek summary judgment as to plaintiff's remaining claims.  (*See* Def. Mem. at 3.)  As an initial matter, in his opposition to defendants' summary judgment motion, plaintiff "agrees to withdraw, or to the Court otherwise dismissing, plaintiff's federal municipal liability claim." (Pl. Mem. at 1 n.1.)  Accordingly, defendants are entitled to summary judgment dismissing plaintiff's federal municipal liability claim.

With respect to plaintiff's remaining claims relating to the alleged use of excessive force, as set forth below, the Court concludes that defendants are entitled to summary judgment dismissing plaintiff's excessive force claim and assault and battery claims with respect to Officer Allende's use of the taser, plaintiff's municipal liability claim, and claim under the New York Constitution.  The Court further concludes that the defendant Officers are entitled to qualified immunity with respect to the use of the taser.  The Court denies summary judgment as to plaintiff's excessive force claim with respect to the Officers' actions in the course of applying handcuffs, or after plaintiff was handcuffed and similarly denies the related assault and battery claims for the same reason.

I.   **Plaintiff's Excessive Force Claim**

Plaintiff alleges an excessive force claim based on
Officer Allende's use of a taser, and defendants use of force in
restraining him either during the application of handcuffs or
after plaintiff was handcuffed.  (SAC ¶¶ 12, 16, 48-51; Scheiner
Decl., Ex. B, at 65:3-6, 69:2-10.)  Defendants move for summary
judgment on plaintiff's excessive force claim, arguing that the
force used was objectively reasonable under the circumstances.
(Def. Mem. at 2, 8-15, 19-21.)

"The Fourth Amendment prohibits the use of
unreasonable and therefore excessive force by a police officer
in the course of effecting an arrest." *Tracy v. Freshwater*, 623
F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S.
386, 395 (1989)).  "Because '[t]he Fourth Amendment test of
reasonableness "is one of objective reasonableness,'" ... the
inquiry is necessarily case and fact specific and requires
balancing the nature and quality of the intrusion on the
plaintiff's Fourth Amendment interests against the
countervailing governmental interests at stake." *Id.* (quoting
*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir.
2004)) (internal citations omitted).  In conducting that
balancing test, courts are to consider the following three
factors: "(1) the nature and severity of the crime leading to
the arrest, (2) whether the suspect poses an immediate threat to

17

the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 489 U.S. at 396; *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)).  In other words, "[a] court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015).

In balancing these factors, courts must be "careful to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Tracy*, 623 F.3d at 96 (quoting *Jones*, 465 F.3d at 61 (quoting *Graham*, 390 U.S. at 396)).  This court recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97.  As the Supreme Court has emphasized, it is important to evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *see also id.* ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (quotation marks and citation omitted)). "It is equally important that courts not isolate a particular act of force by an officer if it was intertwined with other acts

18

of force in rapid succession where there was no reasonable opportunity to re-assess." *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020).

For purposes of defendants' motion, the parties do not appear to dispute plaintiff's allegation that the taser was deployed twice (SAC ¶ 16). Defendants contend that, based on the undisputed facts, Officer Allende's actions were objectively reasonable under the circumstances as to both taser uses. In evaluating defendants' motion for summary judgment on plaintiff's excessive force claim, the court analyzes the two taser deployments independently. *See, e.g.*, *Towsley v. Frank*, No. 09-cv-23 (CR), 2010 WL 5394837, at *7 (D. Vt. Dec. 28, 2010) (evaluating two taser deployments independently). The court also considers plaintiff's excessive force claim based on defendants' use of force during the handcuffing or after plaintiff was handcuffed.

### A. First Taser Deployment

To determine if the Officers' actions constituted unconstitutional excessive force, the court applies a reasonableness inquiry, which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Graham,* 490 U.S. at 396; *see also Amnesty America,* 361 F.3d at 123 (explaining that whether use of force is reasonable depends on "the totality of the circumstances faced by the arresting officer.").

At the summary judgment stage, once the court has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party, the reasonableness of the officer's actions is a pure question of law. *See Scott v. Harris*, 550 U.S. 372, 381 n.8. (2007). The court now turns to the three *Graham* factors (i.e., (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight). *See Graham*, 490 U.S. at 396. Having considered the facts and circumstances in this case, including the *Graham* factors discussed below, the court concludes that Officer Allende's use of the taser was objectively reasonable.

*First*, the court concludes that "the severity of the crime at issue" here -- an alleged physical assault in a domestic dispute -- constitutes a serious and dangerous crime under the circumstances. *Graham*, 490 U.S. at 396; *see, e.g., Hodge v. City of Long Beach*, 425 F. App'x 33, 34 (2d Cir. 2011) (summary order) (noting that "domestic disputes tend to be combustible" and concluding that a 911 call reporting a domestic

20

dispute constituted a "potential severe domestic crime"
(internal quotation marks omitted)); *Whitfield v. City of
Newburgh*, No. 08-cv-8516 (RKE), 2015 WL 9275695, at *12
(S.D.N.Y. Dec. 17, 2015) (individual high on drugs and suspected
of domestic violence posed a danger to himself and the
officers).  "[A]n officer's use of force against a person
suspected of committing a dangerous crime is more likely to be
deemed reasonable than the use of force against a person
suspected of committing a minor offense." *Bryant v. Meriden
Police Dep't*, No. 13-cv-449 (SRU), 2017 WL 1217090, at *7 (D.
Conn. Mar. 31, 2017).  Here, probable cause existed to arrest
plaintiff for a dangerous domestic assault based on the
undisputed facts that Officers received the following
information: (1) the information relayed to the Officers from
the 911 dispatcher that plaintiff was beating his wife (Def.
56.1 ¶¶ 6, 7, 13, 33); (2) Ms. Cosares's eyewitness report to
the Officers that Ms. Scoma had come to her house crying and
pleading for help before plaintiff grabbed her by the neck and
brought her back to plaintiff's home (*id*. ¶¶ 8, 9, 11).[6]  Under

---

[6]      Defendants also contend that once the Officers entered plaintiff's
house, Brielle Scoma came running downstairs from the upper level of the
house, screaming and crying. (Def. 56.1 at ¶ 23.)  Sergeant Vukic, Officer
Craven and Officer Chatha also testified to hearing a woman from inside
plaintiff's house yelling "Help. Help." (Scheiner Decl., Ex. H, at 59:24-
60:25, 64:16-20, 59:24-60:25; Ex. G, at 51:14-18, 134:24-135:6.)  Plaintiff
disputes these allegations and because the court must view the facts in favor
of the nonmoving party, the court does not consider these facts in assessing
the reasonableness of Officer Allende's actions.

the collective knowledge doctrine and the fellow officer rule,
Officer Allende was entitled to reasonably rely on information
from his fellow officers in determining that probable cause
existed to arrest plaintiff for an ongoing domestic assault.
*See Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015).
Accordingly, based on the undisputed facts, the Officers had
probable cause to arrest plaintiff for his alleged involvement
in a serious domestic assault.  Plaintiff's contention that he
was not engaged in an ongoing assault and was not ultimately
charged with domestic assault is of no consequence to the
probable cause determination.  (Pl. Mem. at 10); *see Krause v.
Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) ("[P]robable cause
does not require an officer to be certain that subsequent
prosecution of the arrestee will be successful.").  Thus, the
Officers' understanding of the violent nature and severity of
the crime leading to plaintiff's arrest weigh in favor of
Officer Allende's use of the force.

Second, the court considers "whether the suspect poses
an immediate threat to the safety of the officers or others."
*Graham*, 490 U.S. at 396.  "Courts assessing the threat to
officer safety look both to the officers' statements about their
perception of a threat and objective factors that would justify
such a fear." *Bryant*, 2017 WL 1217090, at *8.  Here, the
undisputed facts confirm that a reasonable officer could have

22

viewed plaintiff as a threat to the Officers' safety.  As noted
above, the undisputed facts confirm that before and upon their
arrival, the Officers were informed that plaintiff was
physically assaulting his wife and had forcefully removed his
wife from Ms. Cosares's home.  (Def. 56.1 ¶¶ 33-34.)  Upon
arrival, after assessing the situation and observing plaintiff's
refusal to comply with the Officers' directions to descend the
stairs, Sergeant Vukic reasonably viewed the scene as
sufficiently volatile and dangerous that he radioed for
assistance from the ESU Officers.  (Def. 56.1 ¶¶ 25-31.)  The
undisputed facts also confirm that plaintiff, perceived by the
Officers as being of large and muscular physical stature and
agitated, continued to refuse to comply with the Officers'
request that he come downstairs from the narrow stairway where
he sat above the Officers.  Furthermore, although plaintiff had
lowered his pants to show officers that he was unarmed (Pl. 56.1
¶ 41), the undisputed facts show that plaintiff was not
restrained and had access to the upstairs, thus potentially
permitting him access to unknown weapons or other items
upstairs.  Based on this record, a reasonable officer could have
viewed the plaintiff's continued refusals to come downstairs,
despite several directives from officers, coupled with the
reported violent crime and plaintiff's unrestrained position on
the stairwell, as an immediate threat to the Officers' safety.

23

Therefore, a reasonable officer could conclude that plaintiff, who refused to comply with the Officers' directions after reportedly assaulting his wife, was reasonably perceived as an individual who had engaged in violence and posed a danger not only to himself, but to the Officers and others in the house. In short, the undisputed record evidence makes clear, and no reasonable juror could conclude otherwise, that at the time Officer Allende deployed the first taser, he had reason to believe that plaintiff posed an immediate threat to the Officers and others.[7]  Moreover, plaintiff testified that after the first taser was deployed, he stood up and a second taser was subsequently discharged.  (Scheiner Decl. Ex. B., at 54:14-17.) Accordingly, the undisputed record evidence similarly weighs in favor of Officer Allende's use of force to subdue plaintiff with a taser.

     *Third*, the court turns to the final *Graham* factor, under which it must determine whether plaintiff's conduct amounted to "actively resisting arrest" and thus establishes

---

[7]    "Courts recognize that domestic disputes not only place the physical safety of victims at risk, but also often threaten the physical safety of responding officers." *Bettis v. Bean*, No. 14-cv-113, 2015 WL 5725625, at *10 (D. Vt. Sept. 29, 2015) (citing *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) ("'The volatility of situations involving domestic violence' makes them particularly dangerous." (internal alteration omitted) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005))).  Accordingly, "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Mattos*, 661 F.3d at 450 (quoting *Martinez*, 406 F.3d at 1164).

that Officer Allende's first use of the taser was reasonable.
*See Tracy*, 623 F.3d at 96.  Here, the undisputed facts show that
plaintiff was continually and actively non-compliant with the
Officers' repeated requests that he come downstairs from where
he sat six or seven steps above the Officers.  Although
plaintiff states that he was asking the Officers why he was
under arrest (Scheiner Decl., Ex. B, at 54:8-14), it is
undisputed that he refused to comply with the Officers'
directives to descend the stairs and that the Officers had
reasonable grounds to believe that the plaintiff committed a
violent crime based on the 911 dispatcher report and the
neighbor's eyewitness statement.  Although neither the Supreme
Court nor the Second Circuit has specifically defined "active
resistance," the Second Circuit has upheld uses of force
involving tasers where the suspect was actively non-compliant
with the Officers' directions.  *See, e.g.*, *MacLeod v. Town of
Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013) (summary order)
(concluding that the use of a taser "to subdue an actively non-
compliant suspect . . . who posed a real and imminent threat to
the safety of the officers and any bystanders" was objectively
reasonable where the officers gave "repeated, clear commands
that [the plaintiff] return to the ground"); *Crowell v.
Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (summary
order) (concluding that the use of a taser was reasonable where

protestors "were actively resisting their arrest" when they chained themselves to a barrel drum).  Indeed, plaintiff testified that he told officers to "get out of this house" and that he chose to sit down in the middle of the narrow stairway, rather than come downstairs and sit on the couch as directed by the Officers.  (Scheiner Decl., Ex. B, at 54:1-4.)  He also acknowledges that he heard the Officers say that he was under arrest, although he also denies he was told he was under arrest.  (Green-Stark Decl., Ex. 3, John Scoma Tr. at 64:5-21, 87:4-11.)

Plaintiff argues that his non-compliance with Officers' directives amounted to, "at most[,] arguably passive resistance" not justifying the use of a taser.  (Pl. Mem. at 13.)  Plaintiff's contentions are unpersuasive, however, because unlike the cases cited by plaintiff where a suspect was already restrained at the moment of the use of force, *see Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 293 (S.D.N.Y. 2014) (denying summary judgment to the defendants where, by the time the taser was used, the plaintiff had been taken to the floor and was being restrained by multiple officers), or detained for a non-serious, non-violent offense, *see Savatxath v. Demer*, No. 15-cv-82, 2018 WL 8755515, at *16 (N.D.N.Y. Mar. 31, 2018) (denying summary judgment to defendant where force was used on suspect stopped for "an obstructed rear view mirror" on suspicion "that he possessed drugs"), here, the undisputed facts establish that

26

plaintiff was unrestrained, uncooperative, and reportedly had engaged in a violent domestic assault. *See Towsley*, 2010 WL 5394837, at *8 (concluding that officer's use of a taser was reasonable where confronted with a suspect with a history of violence who was uncooperative and unrestrained).  The undisputed facts establish that the taser was deployed following plaintiff's active resistance to the Officers' directions and his arrest.  Accordingly, the totality of the circumstances supports the finding that Officer Allende's conduct and use of force was objectively reasonable.

Finally, the court concludes that the remaining undisputed facts under the circumstances support Officer Allende's use of the taser to effectuate plaintiff's arrest. Plaintiff argues that because the Officers failed to issue a warning prior to discharging the taser and fired upon plaintiff when he was in an "elevated position," such action was excessive.  (Pl. Mem. at 13-15.)  Although the court notes that some district courts in this Circuit have weighed the failure of providing a warning and the defendant's stance in an elevated position as factors supporting a finding of excessive force, *see Negron v. City of New York*, 976 F. Supp. 2d 360, 367 (E.D.N.Y. 2013) (weighing the failure to warn before tasing and defendant's placement in precarious position in favor of a finding of excessive force); *Whitfield*, 2015 WL 9275695, at *16

27

(S.D.N.Y. Dec. 17, 2015) (weighing a failure to warn in favor of excessive force (citing out-of-circuit cases)), the court notes that the reasonableness inquiry under the Fourth Amendment considers the totality of the circumstances and not a single factor is dispositive.  *See Amnesty America*, 361 F.3d at 123 (explaining that whether use of force is reasonable depends on "the totality of the circumstances faced by the arresting officer").  The Second Circuit has instructed that the three *Graham* factors are "relevant to the required balancing of governmental interest against the intrusion upon the individual's interests," but there "are no numerical weights to be assigned, and the weighing metaphor has been criticized for creating the illusion of precision."  *Brown*, 798 F.3d at 102. Instead, "[a]ll that can realistically be expected is to make some assessment as to the extent to which each relevant factor is present and then somehow make an aggregate assessment of all the factors."  *Id.*  Thus, although the court acknowledges that some factual disputes may exist with respect to the statements exchanged between plaintiff and the Officers, the material, undisputed facts show that the Officers were investigating an alleged violent crime and were confronted with an uncooperative and unrestrained suspect, resulting in the use of force.  In other words, the court concludes that an "aggregate assessment" of the *Graham* factors and other relevant circumstances, shows

28

that no reasonable jury could conclude that Officer Allende's
use of a taser was objectively unreasonable and therefore
excessive force.

### B. Second Taser Deployment

Plaintiff also argues that the second deployment of
the taser was excessive force. (SAC ¶¶ 16, 48-51.) Officer
Allende testified that he believed that he pressed the taser
trigger only once for approximately five seconds. (Scheiner
Decl., Ex. I, at 84:10-21.) Even if Officer Allende fired the
taser twice, plaintiff's excessive force claim cannot survive
because by plaintiff's own account, he was not incapacitated
after the first taser. According to plaintiff, after Officer
Allende deployed the first taser, plaintiff "stood up" and said,
"What did you shoot me you [sic] with the taser for?" (Scheiner
Decl., Ex. B, 54:15-18, 55:5-6.) After plaintiff stood up,
Officer Allende fired a second charge before Officers subdued
plaintiff and arrested him. (*Id.* at 54:16-20.) Thus, according
to plaintiff's own testimony, he was not incapacitated by the
first taser, stood up and had resisted the Officers' directions
to come downstairs when the second taser was deployed. *See
Treubig*, 963 F.3d at 229 (second tasing may be excessive where
suspect was "subdued face down, arms spread" at the time of the
second tasing); *Greenfield v. Tomaine*, No. 09-cv-8102 (CS)(PED),
2011 WL 2714221, at *5 (S.D.N.Y. May 10, 2011) (second tasing

excessive where suspect was "shaking" from the first taser and
was "lying on the ground" at the time of the second tasing),
*report and recommendation adopted*, No. 09-cv-8102 (CS)(PED),
2011 WL 2714219 (S.D.N.Y. July 12, 2011).

When balancing the government interests at stake
against those of the individual as *Graham* requires,
reasonableness must be judged from the perspective of a
reasonable officer on the scene, and detached hindsight cannot
be used to correct judgments made in "circumstances that are
tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at
396.  In this case, viewing the totality of the circumstances,
Officer Allende confronted an individual suspected of a violent
crime who was uncooperative, unrestrained, and not incapacitated
by the first deployment of the taser.  Accordingly, Officer
Allende's second use of the taser after plaintiff stood up and
continued to resist arrest was not objectively unreasonable.

### C. Use of Force While Attempting to Handcuff Plaintiff or After Plaintiff was Handcuffed

Plaintiff contends that defendants used unlawful force
immediately after he was handcuffed.  Specifically, plaintiff
testified that after he was tased and while he was on the ground
and immediately after being handcuffed, an unidentified officer
put his knee into plaintiff's back and grabbed his left arm,
which "snapped."  (Scheiner Decl., Ex. B, at 65:3-6, 69:2-10.)

30

Although "[o]fficers may use reasonable force to effect an arrest" *Stratakos v. Nassau Cty.*, No. 15-cv-7244 (ADS)(ARL), 2019 WL 6699817, at *5 (E.D.N.Y. Dec. 9, 2019), "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Courts in this Circuit have concluded that "even a minor use of force" is unreasonable when a suspect has already been restrained or handcuffed. *See, e.g., Adedeji v. Holder*, 935 F. Supp. 2d 557, 568-69 (E.D.N.Y. 2013) (same) (collecting cases).

Courts in this Circuit have precluded summary judgment, where, as here, a plaintiff alleges that he was subject to unnecessary force such as "yanking" an arm after he or she was restrained in handcuffs. *See Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising"); *McClendon v. Cty. of Nassau,* No. 11-cv-0190, 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11, 2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim.").

Here, plaintiff testified that after he was tased twice, while he was on the ground and immediately after being handcuffed, an unidentified officer put his knee into plaintiff's back and grabbed his left arm, which "snapped." (Scheiner Decl., Ex. B, at 65:3-6, 69:2-10.)  Medical records submitted with the parties' motion papers bear out the allegation of injury.  (*See* Def. 56.1 ¶ 53; Scheiner Decl., Ex. K, at NYC 165, 169 (reporting elbow pain and fractures).)

Viewing the evidence in the light most favorable to the plaintiff, the court finds that a genuine issue of material fact remains surrounding the Officers' actions and whether plaintiff sustained the injury after he was tased and brought down the stairs to the floor while Officers attempted to handcuff him, or after the Officers succeeded in applying the handcuffs.  A reasonable jury could conclude that Officers used excessive force when, after tasing the plaintiff twice and restraining him with handcuffs, they allegedly yanked his arm back resulting in the elbow injury.[8]  Alternatively, a jury could

---

[8]     (*Compare* Green-Stark Decl., Ex. 17, Gregory Mannino Tr. at 33:24-34:18 ("Next thing I remember is when [plaintiff] was on the ground multiple officers still had to struggle to handcuff him, he was still putting up a fight . . . From what I can recall I just remember when he was on the ground he was moving around, he wasn't being just compliant in putting his hands freely behind his back."), *with* Green-Stark Decl., Ex. 3, John Scoma Tr. at 65:2-6 ("[T]hen [the officer] grabbed my arm and they took me down the stairs and I just went down. And they all piled on me. So now once they handcuffed me, then what he did was, you know, he probably put his knee in the back me and he just snapped my arm.").)

conclude that the injuries resulted after plaintiff was tased and Officers grabbed his arm and brought him down the stairs and continued his physical struggle while Officers attempted to place him in handcuffs.[9]  Plaintiff has the burden to prove that his elbow was injured by the Officers' use of excessive force. If a jury credits plaintiff's account of the events, they may conclude that the Officers' conduct after plaintiff was in handcuffs was excessive force.  On the other hand, if the jury credits the Officers' account, that plaintiff was brought down the stairs after being tasered and continued to struggle and resist as the Officers attempted to place plaintiff in handcuffs, then the Officers' actions may be objectively reasonable, even if plaintiff's elbow was injured during the Officers' attempt to restrain him.  For these reasons, the court denies defendants' motion for summary judgment on the issue of excessive force with respect to the Officers' use of force either in an attempt to handcuff plaintiff or after plaintiff was handcuffed.

---

[9]     In addition, there is some evidence in the record suggesting that plaintiff had two ulna nerve transposition surgeries prior to September 19, 2015.  (Def. 56.1 ¶¶ 58-60.)  In response, plaintiff argues that the prior surgeries are "immaterial to the acute traumatic injuries inflicted to plaintiff's left arm by defendants."  (Pl. Response ¶¶ 60.)  As noted above, a jury may conclude that plaintiff sustained an elbow injury while resisting arrest, but also could conclude that the Officers used excessive force in inflicting this injury after he was handcuffed.  Thus, a factual issue remains regarding when and how plaintiff sustained an injury to his elbow as confirmed by the medical records.  (Pl. 56.1 ¶ 86.)

### D. Failure to Intervene

The Second Circuit has recognized that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). Liability for failure to intercede will attach where the officer in question observes or has reason to know of the underlying wrongful conduct and had a "realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *Id.*

According to plaintiff, the Officers violently and roughly piled on plaintiff, placed their knees in plaintiff's back, and forcefully snapped plaintiff's arm while he was handcuffed, which fractured his elbow. (Pl. 56.1 ¶ 74.) Thus, plaintiff asserts that defendants failed to intervene and prevent the alleged constitutional violations. (Pl. Mem. at 20.) Defendants contend that plaintiff's failure to intervene claim must be dismissed because the Officers had no "realistic opportunity" to intervene due to the quick succession of events and because plaintiff failed to identify the officer who allegedly kneeled on his back and snapped his arm. (Def. Mem. at 19-21.)

The undisputed facts of this case establish that Officers had no "realistic opportunity to intervene," where the

34

alleged use of force occurred in rapid succession.  As noted above, plaintiff testified that his arm was "snapped" within moments after he was handcuffed and that Officers brought him to the floor, handcuffed him, and escorted him outside the house within seconds.  (Def. 56.1 ¶ 50; Pl. 56.1 Response ¶ 50.) Indeed, plaintiff described the event as a "bang-bang play," where the Officers threw him down on the floor, handcuffed him, and snapped his arm back in quick succession.  (Scheiner Decl., Ex. B, John Scoma Tr. at 54:18-22 ("And when I was down, once they handcuffed me, then they snapped my arm. And *it was just that fast*. It was like a *bang-bang play*.") (emphasis added)); *see Johnson v. City of New York*, No. 05-cv-7519, 2008 WL 4450270, at *6 (S.D.N.Y. Sept. 29, 2008) ("Here, there is no evidence from which a reasonable jury could conclude that the other officers had sufficient time to prevent the alleged use of force which, by plaintiff's own account, lasted only for 'a couple of seconds.'" (citation omitted)); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988) (finding no realistic opportunity to intercede in use of excessive force by officer where punches occurred in rapid succession); *Figueroa v. Mazza*, No. 11-cv-3160, 2014 WL 4853408, at *8 (E.D.N.Y. Sept. 30, 2014) (finding that the blows occurred in such rapid succession that defendants did not have a realistic opportunity to intervene).  Thus, because the Officers had no "realistic opportunity to

intervene," the Court grants defendants summary judgment on
plaintiff's failure to intervene claim.

## II.  Qualified Immunity

In addition to arguing that the plaintiff's claims
fail on the merits, defendants also contend that the Officers
are, in any case, entitled to qualified immunity. (Def. Mem.
16-19.)  Qualified immunity protects government officials from
civil damages liability "insofar as their conduct does not
violate clearly established statutory or constitutional rights
of which a reasonable person would have known." *Pearson v.
Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)).  Pursuant to the two-step
framework set forth by the Supreme Court in *Saucier v. Katz*, 533
U.S. 194 (2001), when an official raises qualified immunity as a
defense, the court must consider whether: "(1) . . . the
official violated a statutory or constitutional right, and (2) .
. . the right was 'clearly established' at the time of the
challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d
Cir. 2016).  "As it relates to the second step, the focus is
'whether it would be clear to a reasonable officer that his
conduct was unlawful in the situation he confronted.'" *Treubig*,
963 F.3d at 224 (quoting *Saucier*, 533 U.S. at 202).  In deciding
whether a right is clearly established, "[o]nly Supreme Court
and Second Circuit precedent existing at the time of the alleged

36

violation is relevant." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999)).  Additionally, in determining objective reasonableness, "the relevant question is whether a reasonable offic[ial] could have believed the [challenged conduct] to be lawful, in light of clearly established law and the information the . . . offic[ial] possessed." *Id.* at 115 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

In the summary judgment phase of a proceeding, dismissal will be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

Here, plaintiff argues that the Officers are not entitled to qualified immunity because as of the date of the incident, it was clearly established law that it was unreasonable to deploy a taser "at a misdemeanant who was neither fleeing, actively resisting, nor presenting a threat to the police or others." (Pl. Mem. 15-16.)  In response, the

37

defendants assert that the Officers are entitled to qualified immunity because the actions, even viewed in the light most favorable to plaintiff, did not violate "clearly established" law.  The operative question thus becomes whether it was clearly impermissible on September 19, 2015, under the circumstances presented, for a police officer to use the force that a jury could find Officer Allende used, to twice deploy a taser on a non-compliant and unrestrained suspect suspected of committing a violent crime.

The Second Circuit recently explained that following its decision in *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010), "it was clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others -- whether such force was by pepper spray, taser, or any other similar use of significant force -- violates the Fourth Amendment." *Treubig*, 963 F.3d at 226.  Since *Tracy*, the Circuit has explained that "officers may not use a taser against a compliant or non-threatening suspect." *Muschette on Behalf of A.M. v. Gionfriddo*, 910 F.3d 65, 69-70 (2d Cir. 2018) (citing *Tracy*, 623 F.3d at 96-98); *see also Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017) ("Though the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer

38

poses a risk of flight." (citing *Tracy*, 623 F.3d at 96-98)); *see also Garcia*, 43 F. Supp. 3d at 297 (concluding that it is clearly established in the Second Circuit that "it [is] a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety").

The plaintiff has pointed to no authority, and this Court has not located any, that holds that as of September 19, 2015, it was constitutionally impermissible to use a taser on an unrestrained individual actively resisting arrest for domestic violence, where the officers reasonably believed that such individual was dangerous.  To the contrary, courts have granted qualified immunity to officers when they used pepper spray against an arrestee who was actively resisting arrest or posed a threat to officers.  *See, e.g.*, *Brown v. City of New York*, 862 F.3d 182, 189-92 (2d Cir. 2017) (qualified immunity granted when arrestee refused to comply with instructions to place her hands behind her back for handcuffing and officers warned her prior to each application of pepper spray); *McKnight v. Vasile*, No. 11-cv-6328P, 2017 WL 1176051, at *28 (W.D.N.Y. Mar. 30, 2017) ("[W]here an individual is actively resisting arrest and refusing orders, and the scene presents a risk to officer safety -- courts have granted judgment to the officers on the grounds that the use of pepper spray was not excessive or that the

39

officers were entitled to qualified immunity." (collecting cases)).  The use of a pepper spray, like a taser, constitutes "significant force" and similarly violates the Fourth Amendment if used on an "an arrestee who was no longer resisting and who posed no threat to the safety of officers or others." *Treubig*, 963 F.3d at 226.  An officer is entitled to qualified immunity if "any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

Applying these standards, the court concludes that the Officers are entitled to qualified immunity because although clearly established law prohibits an officer from tasing an arrestee who is "compliant or a non-threatening suspect," *Muschette*, 910 F.3d at 69-70, here, the undisputed facts show that plaintiff was unrestrained, non-compliant, and reasonably perceived as threatening to a reasonable officer on the scene, as discussed above.  Accordingly, this court cannot conclude that every reasonable police officer would view the taser used by Officer Allende, in the circumstances in which that force was applied, as excessive according to clearly established law. Because Officer Allende did not violate a clearly established right, he is entitled to qualified immunity on plaintiff's excessive force claim with respect to the taser.

As previously discussed, however, there are genuine issues of material fact regarding the reasonableness of the Officers' conduct while attempting to handcuff plaintiff or after plaintiff was handcuffed.  There also remains a genuine issue of material fact as to whether plaintiff was injured during or after the handcuffs were applied.  Because these "disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003) (denying summary judgment on a qualified immunity claim after determining in the excessive force analysis that there were genuine issues of material fact regarding the reasonableness of the officers' conduct); *see also Bennett v. Falcone*, 2009 WL 816830, at *6 (S.D.N.Y. Mar. 25, 2009) ("For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient.").  If the jury finds that plaintiff's elbow was injured while Officers attempted to restrain and apply handcuffs, defendants may renew their qualified immunity defense.

## III.  Plaintiff's Municipal Liability Claim

Defendants are entitled to summary judgment on plaintiff's municipal liability claim.  To demonstrate municipal liability under Section 1983, "a plaintiff is required to plead

41

and prove three elements: (1) an official policy or custom that
(2) causes the plaintiff to be subjected to (3) a denial of a
constitutional right." *Lucente v. Cty. of Suffolk*, 980 F.3d
284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490
F.3d 189, 195 (2d Cir. 2007)).  Plaintiff "agrees to withdraw,
or to the Court otherwise dismissing, plaintiff's federal
municipal liability claim." (Pl. Mem. at 1 n.1.)  Accordingly,
the Court grants summary judgment in favor of defendants on
plaintiff's municipal liability claim and dismisses the claim
with prejudice.

## IV.  Plaintiff's State-law Claims

Plaintiff also brings a number of state law claims
including civil assault and battery and a violation of the New
York Constitution.

### A. Assault and Battery

Defendants assert that they are entitled to summary
judgment on plaintiff's state law assault and battery claims for
the same reasons that plaintiff's excessive force claims fail.
Federal excessive force claims and state law assault and battery
claims against police officers are nearly identical. See
*Humphrey v. Landers*, 344 Fed. App'x 686, 688 (2d Cir. 2009)
(summary order) ("[E]xcept for § 1983's requirement that the
tort be committed under color of state law, the essential
elements of [excessive force and state law assault and battery

claims are] substantially identical." (alteration in original)
(quoting *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991))).
For the same reasons that defendants are entitled to summary
judgment on plaintiff's excessive force claim with respect to
the use of a taser, defendants are also entitled to summary
judgment on plaintiff's assault and battery claim related to the
taser.

Because there are genuine issues of material fact that
preclude summary judgment on the excessive force claim with
respect to the Officers' conduct either while attempting to
apply handcuffs or after plaintiff was handcuffed, however, the
defendants' motion for summary judgment on the assault and
battery claim with respect to these actions is denied. *See
Dasrath v. City of New York*, No. 15-cv-766 (AMD)(RLM), 2018 WL
10501877, at *8 (E.D.N.Y. Sept. 25, 2018) (denying summary
judgment to excessive force and state law claims); *Bah v. City
of New York*, No. 13-cv-6690 (PKC), 2017 WL 435823, at *4
(S.D.N.Y. Jan. 31, 2017) (same).

### B. Violation of the New York Constitution

Plaintiff's complaint asserts in his Eighteenth Cause
of Action that all Defendants violated his rights under Article
I, Section 12 of the New York State Constitution. (SAC ¶¶ 127-
29.) Defendants seek summary judgment with respect to this

claim because it is duplicative of federal claims already asserted by plaintiff in this action.  (Def. Mem. 25-26.)

As defendants correctly point out, there is no private right of action under the New York State Constitution where a plaintiff has an alternative remedy under other federal and state laws.  *See Vilkhu v. City of New York*, No. 06-cv-2095 (CPS)(JO), 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008).  Here, plaintiff has a viable claim for excessive force under Section 1983, rendering his claim for violation of Article I, Section 12 of the New York State Constitution -- which applies to unreasonable searches and seizures -- baseless because "any violation of plaintiff's right to be free from unreasonable searches or seizures can be vindicated through [his] viable Fourth Amendment claim." *Vilkhu*, 2008 WL 1991099, at *8 (citing *Coakley v. Jaffe*, 49 F.Supp.2d 615, 628-29 (S.D.N.Y. 1999)). Accordingly, this Court finds that plaintiff's claim for a violation of the New York State Constitution fails as a matter of law and grants defendants' motion for summary judgment to this claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part as follows:

(1)  Defendants' motion is GRANTED with respect to plaintiff's claims for excessive force as to Officer Allende's use of the taser under section 1983, and is DENIED with respect to plaintiff's claim for excessive force as to the Officer' actions during attempts to handcuff plaintiff or after plaintiff was handcuffed; and

(2)  Defendants' motion is GRANTED as to plaintiff's municipal liability claim; and

(3)  Defendants' motion is GRANTED with respect to plaintiff's state claim for assault and battery as to Officer Allende's use of the taser under section 1983, and is DENIED with respect to plaintiff's state claim for assault and battery as to the Officers' actions while applying handcuffs or after plaintiff was handcuffed; and

(4)  Defendants' motion is GRANTED as to plaintiff's claim under Section 12 of the New York Constitution.

The parties are respectfully directed to submit a joint letter no later than February 12, 2021, advising the court

as to how they intend to proceed.  The court encourages that

parties to engage in good faith settlement discussions.

       SO ORDERED.


Dated: Brooklyn, New York
      January 22, 2021

                         /s/
                       KIYO A. MATSUMOTO
                       United States District Judge
                       Eastern District of New York